Good afternoon. May it please the Court, my name is Bruce Howard. I represent the appellant in this matter who is the relator in the underlying QUETAM action, Paul Solomon. There are two key issues upon which this case turns. Issue number one, the District Court improperly drew inferences in favor of defendants in finding that relators' allegations of fraud were based upon publicly disclosed information. And the District Court failed to view evidence in the light most favorable to Mr. Solomon opposing summary judgment in connection with information contained in a document unique to Mr. Solomon called a Memorandum of Agreement, abbreviated MLA in the briefs, sometimes referred to as the MOA. The District Court failed to view favorable inferences from this document regarding the scope of defendant's scheme in the public disclosures. The second issue is the District Court erred in inferring that as part of his job responsibilities, the relator had a duty to disclose fraud. And therefore his disclosures were not voluntary. And in so finding, the District Court adopted an amendment that leads to an unprecedented expansion of the voluntary disclosure doctrine. The first issue, the District Court improperly drew inferences in favor of the defendants in finding that there had been public disclosure of the allegations in Mr. Solomon's complaint. The District Court based this finding on two public disclosures. One was a report by the District Court that did an audit of Lockheed. And the second was a report by the Government Accounting Office approximately six months later. The District Court found that the Defense Contract Management Agency report, the DCMA report, evidenced the fraud at issue in this case. That's based upon nothing more than an inference, and I'll argue it was a huge inference at that, and one that was not reasonable. The DCMA conducted a multi-agency compliance audit of Lockheed's Earned Value Management System, EVMS. Again, it is a compliance review to see if they're complying with an arcane set of standards regarding how to manage a project. They're not accounting standards, project management standards. The DCMA audit consisted of six different agencies who participated in the audit. There was participation by the Defense Contract Management Agency Earned Value Center, the headquarters out of D.C. There was the local DCMA contract management office out of Fort Worth. There was the Defense Contract Audit Agency, the DCAA, which has powers that extend beyond just EVMS compliance, but also billings and the like. It's broader than just EVMS compliance. The Naval Air Systems Command participated in the audit. The Joint Strike Fighter System Program Office out of Wright-Patterson participated, as did the Joint Strike Fighter Program out of Washington, D.C. Six different federal agencies participated in this audit. The audit found that Lockheed was noncompliant with 19 of 32 industry guidelines contained in the Earned Value Management Standards. It did not find fraud. It found noncompliance. The GAO report relied upon the DCMA report regarding Earned Value Management System compliance. They did not do their own audit, but expressly referred to the DCMA's findings. While the GAO was critical of Lockheed's use of management reserve, they did not find fraud. In fact, while they were alarmed by the depletion of management reserve, which is a fund that is supposed to be used for unexpected contingencies that arise during a contract, but the rules expressly say it's not to cover cost overruns. Lockheed had massively depleted management reserve. The GAO was concerned about that, but they did not find fraud. In fact, the most they found was that a root cause analysis was necessary in order to find out why there was this massive depletion of fraud. There is no connection between the misuse of management reserves and the submission of the false claims in this case. The district court inferred that the misuse of management reserve impacted Lockheed's submission. In so doing, it's drawing an inference improperly, because it's going against relater on a motion for summary judgment. Northrop argues that the inference that the misuse of management reserves impacted the award fee claims comes from a separate piece of information that was publicly disclosed. That's not something the district court relied upon, but they're saying, regardless of the district court's inference, there is a piece of data out there. It is a model contract of the SDD, the system design and development contract, on the F-35, over 1,200 pages long. If you drill into it, there's something that links the cost performance index to award fees. Northrop argues that you can infer from these two data points the fraud. In so doing, they claim that anyone with passing knowledge of government contracts could speculate that the possible motive for improving these metrics could be to enhance award fees. That's the basis that Northrop argues the inference is there. I would argue that that is not a reasonable inference and that the objective evidence says so. You have Mr. Solomon, who's an EVMS auditor in-house, an employee of Northrop, who never found fraud while he was an auditor, never suspected that the noncompliance he had at Northrop that never found fraud. There should have been counterparts of both a Lockheed employee doing EVMS surveillance and a DCMA resident auditor at Lockheed. No evidence of any finding of fraud by those auditors. As I said, the DCMA report consists of six different federal agencies or departments that participated in that audit. At best, they found noncompliance with the EVMS standards. There is no finding of fraud. Simple noncompliance should not be a basis for inferring fraud. Mr. Solomon was removed from the F-35 program in August of 2007. He was removed from the project by Northrop, his employer. He was still employed. He was frustrated at Northrop's failure to address the noncompliance issues he highlighted. A contractor is supposed to come up with corrective actions when noncompliance is found, and Mr. Solomon did not believe that his noncompliance findings were being adequately addressed, and he sought to institute an ethics investigation internal to Northrop. In the process of gathering evidence for his ethics investigation, he came across the Memorandum of Agreement. It is a document from 2005 that memorializes an agreement between Northrop and Lockheed. The agreement was reached on January 19, 2005. We have the date of the meeting. An estimate at completion had been developed. This is essentially the realistic estimate of what the entire contract is going to cost at the end of the day, the system design and development contract. The Memorandum of Agreement demonstrates they knew what the realistic expectation was at that time, but out of, quote, affordability considerations, they were going to intentionally submit a false statement to the government that understated Northrop's share of the estimated cost at completion by $233 million. That has nowhere been publicly disclosed by anyone other than Mr. Solomon. That sets up the scheme. They intentionally falsified the estimated cost of the program. Having done so, then, they implicitly in the agreement, that's going to cause cost overruns, and that makes us look bad. So that's a critical element of the fraudulent transaction that was not in the public domain. That's sort of a friendly question. The test is if it's a critical element of the fraudulent transactions themselves in the public domain, and they're not, because people don't know that that's disclosed until he discovers that. Correct. That's correct. And that's a critical element. It's whether the critical elements were already out there, or whether this is a key, this MOA is a key that unlocks everything and shows why it's fraud. Yes, Your Honor. This sets up the scheme and ties it to the false estimate at completion. In the DCMA audit, all they concluded was, you guys are not properly calculating your estimate at completion, and there's no link to subsequent cost overruns or to the subsequent misuse of management reserve. It's just right now, you're not properly calculating the EAC. What Mr. Solomon does is he demonstrates. They know how to calculate it. What was submitted to the government was a knowing false statement. It wasn't from a lack of understanding about how to calculate an EAC. They did it intentionally. That sets up the scheme. Once they understate the cost of the program, in order to keep the funding flowing, they recognize it's going to lead to cost overruns, and those look bad. Therefore, they say, explicitly, we're going to cover Northrop's cost overruns through management reserve. As I said earlier, the EVMS standards say management reserve is for unanticipated events but cannot be used to cover cost overruns. Did either the DCMA or the GAO say that the cost overruns would be done through the management reserve or give anyone an ability to figure that out? GAO simply recognized that there was a massive depletion of management reserve. And they called for a root cause analysis saying, this is alarming, but we don't know why it's happening. We should figure it out. So I'd say there's no inference to be drawn from the GAO report. The DCMA had various criticisms of how Lockheed was calculating and using management reserve. They don't tie it to the submission of any claims to the government. They don't say it was done fraudulently. And, in fact, there's one anecdote within the DCMA report where Lockheed had misused $97 million worth of management reserve. And the DCMA has what they call discrepancy reports. And there's two levels. One level says, this is very serious stuff. You need to fix it before we can close out the audit. The second level, a discrepancy report level two means it's not serious enough to keep this audit open, but please fix it. And that was the level that the DCMA assigned to that $97 million misuse of management reserve. They clearly didn't make the link to the submission of claims to the government. They didn't even think it was an issue worth keeping the audit going. Counsel, it seems to me that what the case law has not required is that the entire picture be developed by the public entity. One of the phrases is, public disclosure must provide specific details about the fraudulent scheme that could put government investigators on the trail of what was really going on. What you're focusing on in this 2005 memo is whatever it means. But at best, it means that there's some confession of a scheme. But you have the evidence already of these accounts being not mismanaged, but poorly managed. And so it does seem to me that the real question here is not whether the government was going to pursue it. That's not the issue in one of these cases, is whether there was enough in the public disclosure that could have led investigators on the right trail. And that, what do you say to that? Am I wrong on the law, or is it the facts don't support that that applies here? The findings were of noncompliance, and I would claim the application of the law to those facts suggests that it is not reasonable to believe that a fraud investigator based upon simple noncompliance would jump to the conclusion this is due to fraud. And when you have the DCMA report with six different entities, including the defense contract audit agency, not making any connection, not suggesting any of the noncompliance is fraud, I would suggest that the objective evidence would say that that inference is not reasonable. All right, counsel. May it please the Court, Neil O'Donnell for Northrop Grumman. I'm going to be addressing the issue of voluntary disclosure as a requirement for original source, and Mr. Bronson, who is going to be addressing the public disclosure issue, as well as the direct and independent requirement for original source. Your Honor, the district court was right that Mr. Solomon, the relator here, did not qualify as an original source. It followed the existing case law, which says that what matters is not who the employer is, but rather what the job duties of the person are. Could you maybe move the microphone closer to you or something or speak up a bit? Sure. The acoustics in this room are terrible. Absolutely. Thank you. And Mr. Solomon, under those standards, simply did not, cannot qualify as having done voluntary disclosure. This Court's decision in Little is particularly instructive in that regard. The relators in Little were auditors from the Mineral Management Service of the Department of the Interior, and the government specifically argued that all government employees were prevented from being relators, and the Court rejected that. It noted that the language of the statute permitted quid tam actions by any person, and there was no exception regarding government employees. In other words, there was no textual basis to distinguish government employees. Rather, in a critical section of the decision, what it found was that the auditors could not be voluntary sources by looking simply at what their job duties was. There was no mention of there being government employees, and it found if a relator is employed in order to discover fraud and report it to the government, then he cannot meet the voluntary disclosure standard. Mr. O'Donnell, two points. One is, Little always seemed to me to be kind of a confusingly written opinion, but I'm glad you got something out of it. The actual question is, it seems to me that there's a difference between Northrop or Lockheed hiring somebody to provide reports, to do investigations, provide reports, and the government itself to be providing somebody who's performing essentially those functions as well. I don't know if it's a matter of the hierarchy who's involved, the conflicts that might arise when you're employed by the entity being, directly employed by the entity being investigated. Isn't there at least a difference in the number of auditors we were dealing with in Little in most cases in this one? Your Honor, I'd agree with that if we were talking about a government contractor employee in the normal course. But here, Mr. Solomon was in a very specific situation. He was the EVMS monitor who was designated under the joint surveillance plan that the government and Northrop Grumman had entered into. And under that plan, he had a very unusual duty, and that was a duty to report fraud directly to the government. Well, the reason it's unusual is because it does end up working against your employer. And that's the kind of dynamic that worries me in extending this. I'm not saying you're wrong. There's a lot on your side of this point. But there is that barrier hurdle, it seems to me. It is a very unusual situation because it's fraught with conflict. Your Honor, the cases have specifically indicated that it is not the fact that there may be some difficulty in reporting that distinguishes the situation, both the Biddle case from the Ninth Circuit and the Prather case from the Ninth Circuit more recently. Both noted that the relator there, a government employee, was arguing that there were restrictions put on them. The ACO in Biddle argued specifically that he was instructed not to act as an auditor, not to find fraud. And the Court said that's not what's important. What's important is what the job duties are. And Mr. Solomon presents exactly the point that underlies the policy against allowing people who are responsible for reporting fraud to the government to act as relators. And that is that you create the situation discussed extensively in the Ninth Circuit of a divided loyalty. You have an individual who has this job obligation to report to the government fraud that's occurring. And at the same time, they have a private pecuniary interest. And that is what the courts, the court in Fine, the court in Biddle, this court in Little, have indicated should not be the case and should be precluded from being allowed to occur. So we have a situation where Mr. Solomon was acting under a specific responsibility to report problems and discrepancies that occurred in the EVMS system. The EVMS system, which is not some highly arcane thing. It is the principal cost performance measurement for the Department of Defense. And he understood, he was directed, he actually wrote the plan that's at 1611 in the ROA that required that he work with the DCMA EVMS person as well as the DCAA auditor. And he was required specifically to look at the issues of estimate at completion and the issue of management reserve. That's at pages 1612 and 1613 in the Record of Appeal. And he made findings from that, Your Honor, which were specific findings that indicated, and I'm quoting from 1715 in the Record of Appeal. This is a report of Mr. Solomon's in August of 2007. Management reserve was improperly used to offset accumulated cost overruns for the mere purpose of improving performance metrics instead of being held for current and future needs. That's, he understood what his obligations were, which were to report problems, problems which amount to fraud, and he did do that. He said in a report in August of 2007 at 1736 in the ROA, management reserve was used to duties. Your Honor, if you look to Mr. Solomon's declaration that was filed in opposition to Northrop Grumman's motion for summary judgment here, he has a very telling paragraph in which he says, and this is at paragraph 54, in the course of my surveillance duties on the JSF program, I uncovered numerous instances in which Lockheed and Northrop misused management reserve budget to falsely improve Northrop's cost performance numbers and, in turn, Lockheed's program-wide cost performance. He's going to the specific allegations, which are the ones that he is, by his own words, indicating that he provided those as part of his obligation in carrying out his responsibilities. Could you please remind us of what authority would extend to the private employer? Who has ever done that? We don't want to be pioneers. You're not a pioneer, Your Honor. Good. The District Court in District of Columbia, in the Faust case- Some of us may want to be pioneers. Go ahead. You can answer the question fully. Thank you, Your Honor. In the Faust case, which was cited by the opinion in Little, was a situation where there were two auditors who worked first for the Office of Personnel Management. Then they left the Office of Personnel Management, went to work for a private firm which had a contract with the Office of Personnel Management. Then they went back again, later, the Office of Personnel Management. And the Court faced specifically the question of whether there was a difference from the period when they were acting as private contractors from the time that they were acting as government employees. And citing fine, the Court said, no, there wasn't, because in both instances, if you look to the employment obligation, it was to report fraud to the government. And that is what is the critical thing. Let me address just briefly the memorandum of understanding. It seems to me that this Court's decision in Freed tells us the answer of the standard to apply, and that is whether there is anything that is qualitatively different. And Solomon's own words show that there is not anything that is qualitatively different about the memorandum of agreement. It alleges essentially that Lockheed Martin and Northrop Grumman had a possible agreement to use program reserve to cover Northrop Grumman's cost overruns in circumstances that Mr. Solomon believed were improper. That is precisely what he said in his reports, in his management reports, was being done. It is precisely what he alleges he includes in his declaration was being done, that Northrop and Lockheed together were misusing management reserve in order to cover cost overruns. And it is also, as Mr. Bronson will address, what he alleges was included in the DCMA report. Thank you, Your Honors. May it please the Court, Michael Bronson for Lockheed Martin. Your Honors, the test for whether Mr. Solomon's allegations were publicly disclosed, which Mr. Solomon did not address, is the standard laid out in the Reagan and Little and Colquitt cases, which the Court and Colquitt analyzed as an X plus Y equals Z formula, where X represents the allegedly false facts, Y is the true set of facts, and Z is the resulting inference of fraud. Mr. Solomon's argument focuses squarely on the Z element. He suggests that there's no claim of fraud, of outright fraud in the public disclosures, there are no explicit references to knowing or intentional conduct in the public disclosures, so therefore the public disclosure bar is not triggered. The first reason that argument is without merit is the law is clear that the word fraud or allegations of outright fraud don't have to be disclosed. There was no prior disclosure like that in Colquitt, for example, or Jamison. Do we have any, what's your best case for saying that a report like this is sufficient in ways that it found explanations other than fraud? And so it isn't, it's not that it was uncertain, there was really a conclusion implicitly that there wasn't fraud. Your Honor, look most recently to the Colquitt case from this Court. You're about to tell me what I was probably going to ask you, so go ahead. There there was a report by Abbott Labs indicating that certain stints were appropriate for biliary use. There was nothing on the face of the submission that suggested that that was a problem, much less that it was fraud or other knowing misconduct. The Court there found there was a public disclosure because elsewhere in the public domain documents could be found and synthesized, which is all that the standard requires, that publicly disclosed information can be synthesized from disparate public sources. And if the X, the alleged false set of facts and why the true set of facts can be determined, that standard tells us what the inference of fraud is and there need not be an explicit allegation. Well, wasn't the X and Y both in the public disclosure, and what's troubling me about this just a bit is that there was a resolution of why this particular effect on the account occurred. And it was not a fraudulent, an explanation of fraud, which is not quite, I think, what you just addressed. It may be actually, what you addressed may be a harder case, I don't know, but it's not the same as what we have here. Well, we do think these facts present a much clearer public disclosure than in Colquitt or frankly any of the cases that the parties have cited to the Court. The reason this matter was not addressed as a fraud case is because there was no actual fraud here. There were administrative findings that gave rise to an inference of fraud, and that's why we think there's no merit to the case, because the government, the DCMA, certainly has access to a lot more of the underlying information than Mr. Solomon does. That's one of the several reasons Mr. Solomon has no direct or independent knowledge of his allegations against Lockheed Martin. He's guessing at what happened between Lockheed Martin and its government customer. DCMA came in and they determined, it's all on the face of the audit report, they determined an alleged false set of facts, which was that Lockheed Martin was misusing management reserves to understate cost overruns and improve its cost performance. And it disclosed that, in fact, the cost overruns were much higher, in one case to the tune of about $124 million. And the DCMA actually went beyond that. The DCMA actually also noted that Lockheed Martin gave a, quote, justification of purposeful and intentional conduct, and that the DCMA did not accept that approach and determined that Lockheed Martin's actual purpose was to improve its cost performance metrics. That is actually, we believe, the disclosure of the Z. So the X and the Y are that Lockheed Martin, on the one hand, was understating cost overruns. On the other hand, the true set of facts, the cost overruns were much higher. The Z is that they were misstating the purpose for what they were doing. That is all disclosed in the DCMA report and other documents. As to the Level 1 argument that Mr. Solomon's counsel made, very similar point, Your Honor. We believe the fact that this wasn't elevated is irrelevant. The question is only whether this is public and satisfies the test. DCMA, again, clearly understood the facts much better than Mr. Solomon does. I'd like to address the MOA as well, Your Honor. The district court here correctly held, in our view, that the MOA is evidence, at most, of an alleged conspiracy that can't exist independent of the underlying FCA claims, which we believe are publicly disclosed. Mr. Solomon did not appeal the dismissal of the conspiracy count. So that's one reason to set that argument aside. There are other reasons based on the record in the law. As Mr. O'Donnell said, the DCMA report and other disclosures say Lockheed Martin was improperly using management reserves to cover cost overruns of its subcontractors, including Northrop Grumman. The MOA adds nothing to that. And the Colquitt case analyzed this Court's decision in the Federal Recovery Services case from 1995. In both those cases, the relators argued that their investigation unearthed additional instances of fraudulent conduct. But the court held in Colquitt that contributing more of the same does not change the nature of the core allegations. Okay. So it really depends on whether we believe this is like what Colquitt says demonstrates a new and undisclosed relationship between disclosed facts. That's his argument, that it's a new and undisclosed relationship between the facts. And so we have to decide whether or not there is, in fact, a new and undisclosed relationship between the facts. And, Your Honor, we would certainly submit that there clearly is not, and that, again, what Mr. Solomon is asking you to do is look at that document and infer, directly infer fraud. You don't have to do that. You go back to the X plus Y equals Z test. And, Your Honor, we would submit you also don't have to do that because Mr. Solomon, before he started briefing these issues in the case, alleged in his own complaint, in his amended complaint, this is paragraph 191, ROA 150, that Lockheed Martin's publicly disclosed practice was, quote, very unusual and strongly indicative of the fraudulent scheme. So we would argue that is an acknowledgment by Mr. Solomon that there was an inference of fraud here. We would submit that as actually conclusive on the public disclosure issue. How would you articulate the standard X, Y, and Z? Not that. How would you articulate the standard of what has to be available in the public disclosed information? I mean, I talked earlier, quoting from one of our cases, about it's enough there to allow investigators to go down the path to find whatever it is to be found. How would you put it? What should we be thinking of? Well, that the disclosures have to be enough to put the government on the trail of fraud. That's one thing this Court has said. Here the government didn't need that because the government was the entity that publicly disclosed these allegations. Does it matter that the government did not seem interested in going down that path? Your Honor, it does not. Because you go back to the standard. All the government has to do is have, be put on the trail of knowledge to articulate it in the way that you asked and to have the alleged false set of facts and true set of facts available in public sources. Briefly, Your Honor. If there is any doubt, we have to reverse, though, don't we? Because it's a summary judgment and all you need is an issue. Well, you have to have a genuine issue of material fact. And we would submit that the public disclosures here are clear, they are conclusive. Mr. Solomon has not created a genuine issue of material fact. There's no question of fact at all. And that especially goes for the based upon inquiry and the last issue I'd like to touch on, which is the direct and independent knowledge issue. Again, in Mr. Solomon's own complaint in this case, he cites the DCMA report. And the GAO report. And comments on the Senate floor. So these are the same disclosures. We're talking about triggering the jurisdictional bar. He cites those or relies on those nine times in his original complaint. More than 25 times in his two complaints in this case. And as you know, the law of the circuit is that a key TAM action is jurisdictionally barred if it is even partly based upon the public allegations or transactions at issue. Mr. Solomon can't possibly suggest that the DCMA report, the GAO report, don't reveal at least some of his allegations in this case. Those are the same documents he cites in his own complaint in support of his own claims. Now, Your Honors, because Mr. Solomon... You're probably going to say because there is no fraud. But why weren't the auditors, they didn't have any suspicion that there was fraud during the relevant time period. That the noncompliance was due to fraud. Why didn't the auditors have any suspicion? That would tend to make you think that it wasn't so readily apparent. Well, Your Honor, I can't speak to, and I don't think the record speaks to what the auditors were suspicious of. What we can say is, you foreshadowed my answer. There was no fraud. The auditors would come in and the auditors would ask about this practice. The auditors documented a number of noncompliances. And then they would go talk to the government customer. Which, again, Mr. Solomon has no firsthand knowledge of any of the communications running between Lockheed Martin and the government customer. Those explain why there's no fraud. But again, that goes to the merits of the case. There's no jurisdiction to reach those. But those communications running from Lockheed Martin to the government, for a prime contractor, for Lockheed Martin in this case, that is the information on which this case has to be based under the DCMA. DCMA has access to that. Mr. Solomon cannot know, and does not know, any of that information. Never worked for Lockheed Martin, never worked at Lockheed Martin, never communicated with Lockheed Martin and its government customer about any of the issues. Contract modification, estimates of completion, Lockheed Martin's EVMS, management reserves, those facts are undisputed. He had to have firsthand knowledge. He had to get this MOA to rely on it for purposes of this case. And the original source analysis, he had to have some participation in developing that or authoring that. He did not. It is undisputed that that document was authored before Mr. Solomon was on the program, and he got his hands on that document after. Are you answering a question? I'm sorry, Your Honor. Because your time is up. Oh, I'm sorry, Your Honor. I am not answering a question. Wrap it up, please. I am wrapping up. Mr. Solomon is not an original source of these allegations. They are publicly disclosed, and we would ask the Court to affirm. Thank you. Okay, thank you. On the issue of voluntary disclosure, I think the first error by the District Court was that it inferred Mr. Solomon had a job responsibility to disclose fraud. His job responsibility description was to be a compliance auditor. Were they properly calculating an EAC? It is Northrop that had the obligation as the contractor, if it detected fraud, to report fraud to the government. There is a question of whether Mr. Solomon's job description said he had to report fraud. On a factual level, though, I think it is uncontested that while Mr. Solomon had F-35 responsibilities, he did not suspect fraud. Noncompliance is not fraud. He was frustrated that they weren't coming up with corrective actions. Northrop in this case knew what corrective auditing is. First, it is to identify when problems are developing on a program. Are costs rising? Let's identify that because we have to try and contain costs. If there seems to be a problem developing, corrective actions are supposed to be instituted. Try and get it back on course. That has nothing to do with the scheme in this case where they knew up front. They had understated the whole cost of the program, and they weren't going to be able to keep those numbers. Mr. Solomon was just there to audit whether or not there was compliance with identifying developing problems and instituting corrective actions. He did not suspect fraud, therefore could not have reported fraud while he had surveillance responsibilities on the F-35. Are you arguing that he would have been barred in some way or was outside of his duties if he suspected and found evidence of fraud, that they were somehow prevented from reporting that? Your Honor, I don't believe that would be a bar to Mr. Solomon, who is not a government employee. The purpose of the 1986 amendments to the False Claims Act, the overriding purpose, was to encourage relators to step forward to help the government recover fraud, to recover funds. The way to do that was to provide an incentive for them to do so. There is a risk-reward behind the False Claims Act. When a relator who is employed by a government agency by an employer who is committing fraud reports it, he risks his livelihood. He risks being able to put food on the table, clothing on his family's back, shelter over his family's head. They may retaliate against him. And the fact that there's anti-retaliatory measures in the False Claims Act is express recognition that a relator who is an employee of a corporation puts his job at risk. Therefore, he deserves a reward. Mr. Solomon is in that situation where he would put his job at risk by reporting fraud. This is unlike the government fraud investigator who does not report fraud that he sees and tries to take advantage of it. The government fraud investigator bears no risk when he is investigating fraud. And should he report that properly, there's no chance of retaliation. There's zero risk. Therefore, there's no reason to hire a corporate employee who discloses fraud. Mr. Solomon, while he had responsibilities on the F-35, reported all the noncompliance he saw, didn't suspect fraud. Therefore, there was no fraud report or referral. He reported what he saw. It wasn't until they removed him from the program in the form of possible retaliation for aggressive noncompliance findings. The prototypical relator who's blowing the whistle, at least in terms of noncompliance, they remove him from the program, and that's when he discovers the MOA in the course of preparing his ethics complaint for an internal investigation. And in the course of finding the MOA, that defines a scheme of fraud that is much broader in scope than that which can possibly be inferred from the DCMA. In the course of preparing his report, he then realized the link between the noncompliance and it resulting in the submission of false claims. And not until that point, he no longer had any responsibilities on the F-35. There's no further questions? Thank you for your consideration. Thank you very much. This case is submitted.